FILED

2016 JUN 29 AM 11:46

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FL
OCALA FLORIDA

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

Case No.: 5:16-cv-438-Oc-30PRL

ROSTISLAW KINDRATIW,

Plaintiff,

Vs.

FAMILY BROODMARES V, LLC,

Defendant.
_______________________________/

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff sues defendant and alleges:

**JURISDICTION AND VENUE**

1. This action arises under Section 10(b) of the Securities Exchange Act of 1934, as amended ("Exchange Act"), 15 U.S.C. §78(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated by the SEC thereunder.

2. Plaintiff also brings Florida state law claims, arising under the Florida Securities and Investor Protection Act, Fla. Stat. §517 et seq. ("FIPA") and common law claims for breach of contract, fraud in the inducement, and promissory estoppel.

3. This Court has original jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1331 (federal question jurisdiction). This court pendant, ancillary, and/or supplemental jurisdiction over the Florida state statutory and common law claims pursuant to 28 U.S.C. §1367(a), since these claims form part of the same case or controversy as the federal question claim.

4. Venue is proper in this district, pursuant to 27 of the Exchange Act, 15 U.S.C. §78aa and Section 1391 of the Judicial Code, 28 U.S.C. §1391, in that (1) the defendant's principal place of business is within the Middle District of Florida; and (2) all of the acts and practices constituting violations of the Exchange Act, including (1) the knowing and reckless employment of schemes and artifices to defraud, the engagement in acts, practices, or courses of business which operated as a fraud and deceit upon the plaintiff and the making of untrue statements of material facts and the omission to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and (2) acts otherwise giving rise to the claims asserted herein, occurred within Marion County, Florida, within the Middle District of Florida.

5. In connection with the acts, transactions, and occurrences referred to in paragraph 4 and which are described in detail in this complaint, the defendant, directly and indirectly, used the means and instrumentalities of interstate commerce, to wit: wire transmissions, telephone communications, and internet electronic mails.

**FACTUAL ALLEGATIONS COMMON TO ALL COUNTS**

6. The defendant is a Florida limited liability company which owns the Thoroughbred breeding stallion, named "Big Drama." The defendant, in its own right and through affiliated ventures (Family Broodmares I, II, III, IV, V, and VI) regularly engages, either for all or part of its time, directly or indirectly, as broker or principal in the business of offering, buying, selling, or otherwise dealing or trading in securities.

7. Beginning in November of 2011, defendant began advertising, marketing, and selling a limited number of "Lifetime Breeding Right" Certificates ("Certificates") to the public,

urging potential investors to "invest" in what was touted as unique investment opportunity in one of the thoroughbred industry's top young stallions.

8. The defendant represented in advertisements for the sale of the Certificates that "there is no obligation to breed your mare" and "if you choose not to breed at any time" during the life of Big Drama, the defendant would pay the advertised stud fee for that year for Big Drama as compensation, on a super-priority basis, to the holder of the certificate no later than January 31 of the year following the breeding season under which the certificate holder elected not to breed a mare. True and Correct copies of the advertisements are attached hereto as Exhibit "A."

9. Beginning in early November 2011, the defendant began to solicit, offer, and negotiate the sale of certificates to the plaintiff, then a 67 year old retiree, who did not have mares to breed to Big Drama and who was uninterested in buying mares that he would be suitable to breed to Big Drama.

10. The plaintiff is not an accredited investor as that term is defined in the Securities and Exchange Commission's Regulation D.

11. The plaintiff is, and at all times material has been, an unsophisticated investor whose investment experience was limited to conservative purchases of publicly traded companies through large commercial brokerages. The Plaintiff has no prior experience in the purchase of unregistered securities.

12. Between November 1, 2011 and December 22, 2011, the defendant told plaintiff on several occasions that, despite the fact he did not own any mares suitable to breed to Big Drama and was not interested in acquiring mares suitable to breed to Big Drama, that any investment in the certificates was nevertheless a "no brainer," because even if the plaintiff did

not breed to Big Drama he would be paid the advertised stud fee for Big Drama ($10,000, at the time) on a yearly basis for each certificate he purchased, for as long as Big Drama was alive and fertile. The defendant explained that "It doesn't matter if you don't breed or have mares to breed—you can just take the cash every year in January and when the stud fee goes up, that's just means you can take more cash. This is a no-lose proposition and your investment is guaranteed, because if the stallion dies or can't breed we will refund the full investment."

13. All of the foregoing representations were made by the defendant to the plaintiff for the purpose of inducing the plaintiff to invest in the Certificates.

14. On December 22, 2011, the plaintiff purchased Certificate numbers 4 and 5 and paid the defendant $67,500.00 in exchange. True and correct copies of the Certificates are attached hereto as Exhibit "B."

15. The Certificates are "securities" within the meaning of the Securities Act of 1933, as amended (the "1933 Act").

16. The Certificates are "securities" within the meaning of FIPA.

17. The defendant, at all times material, was not and is not registered with the Florida Department of Banking and Finance as a dealer, associated person, or issuer of securities.

18. In calendar years 2012, 2013, and 2014, Plaintiff elected not to breed any mares under either certificate to Big Drama and defendant accordingly paid the plaintiff the advertised stud fee for that year.

19. Again in 2015, Plaintiff elected not to breed any mares under either certificate to Big Drama, but the defendant did not pay the advertised stud fee for Big Drama to plaintiff under either certificate.

20. Plaintiff has made demand upon defendant for payment of the advertised stud fee and defendant has refused to pay the amounts owed, asserting now that there is no right of the plaintiff to the cash compensation which was previously paid, promised, and agreed to.

21. Defendant had a duty to fully and fairly disclose to plaintiff all information relevant to the evaluation of the risk and the merits of an investment in the Certificates, but instead misrepresented and omitted material information from the disclosures and representations that were made to the plaintiff for the purpose of deceiving plaintiff about the true value and nature of his interest, investment, and return on investment in the certificates.

22. The representations made by the defendant to the plaintiff concerning the payment of advertised stud fees in the event the plaintiff did not breed to Big Drama, "at any time," were false, and known to be false by the defendant.

23. As a private seller of unregistered securities the defendant was under a material duty to provide plaintiff with information about the certificates substantially similar to that which would be contained in a prospectus and the defendant failed to make such disclosure. Moreover, the defendant's duty to make full and fair disclosures of all material information was heightened because the defendant was the initiator in all the transactions described herein, and defendant was aware that the plaintiff, in determining the suitability of potential investments in the certificates, was relying upon the defendant as a fiduciary.

**COUNT I**

(Violation of the Securities Exchange Act of 1934, as Amended)

24. Plaintiff realleges paragraphs 1 through 23 as if fully set forth herein.

25. From November 1, 2011 through the present date, defendant has violated the provisions of Section 10(b) of the Securities Exchange Act and Rule 10b-5, in that, by use of e-

mails, wire transmissions, telephone and facsimile lines, and the facilities of interstate commerce, in connection with the purchase or sale of the subject securities, defendant has:

a. employed devices, schemes, or artifices to defraud;

b. made untrue statements of material facts and omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading to plaintiff; and

c. engaged in acts, practices, or a course of business which operated or would operate as a fraud or deceit upon plaintiff.

26. The defendant misrepresented one or more material facts by stating that there was no need to breed any mare to Big Drama and that, at any time during the lifetime or fertility of Big Drama, plaintiff would be paid the advertised stud fee for that year in cash no later than January 31st.

27. In addition, defendant failed to disclose certain material information, including that the option to not breed and receive compensation would end, before Big Drama either died or became infertile, that the certificates were unregistered, did not meet the criteria of any valid exemption from registration in the State of Florida pursuant to F.S. 517 or federal registration pursuant to sections 4(1), 4(2) of the 1933 Act, or pursuant to the federal exemption commonly referred to as the 4(1 ½ ) exemption, and that the purchase of the certificates involved a high degree of risk.

28. These misrepresentations and omissions were made knowingly, or with reckless disregard for the truth thereof, and with the intent to deceive or defraud. As such, the misrepresentations were all schemes, devices, and artifices to defraud within the meaning of SEC

Rule 10b-5(1), as well as acts, practices, and a course of business which operated as a fraud and deceit upon the plaintiff, within the meaning of SEC Rule 10b-5(3).

29. The defendant made the representations and omissions in connection with the sale of the certificates to the plaintiff.

30. Plaintiff justifiably relied on the defendant's misrepresentations of material fact in making a determination that an investment in the subject securities was a suitable investment for him.

31. Defendant's omissions from disclosure of material facts created a material misimpression, which induced the plaintiff to purchase the subject securities.

32. Defendant's misrepresentations and/or omissions directly and proximately caused plaintiff suffer monetary loss.

WHEREFORE, Plaintiff hereby demands judgment in his favor against defendant pursuant to Section 29(b) of the Exchange Act, for rescission, as applicable, plus prejudgment interest.

**COUNT II**

(Cause of Action Under F.S. §517.211 for Violation of F.S. §517.07 & §517.12)

33. Plaintiff realleges paragraphs 1 through 23 as if fully set forth herein.

34. Pursuant to F.S. §517.07, it is unlawful for any person to sell or offer to sell a security within this state unless the security is exempt under F.S. §517.051, is sold in a transaction exempt under F.S. §517.061, is a federal security, or is registered pursuant to Chapter 517, Florida Statutes.

35. The investments offered and sold to plaintiff by defendant were securities as defined by F.S. §517.021, and constituted the sale of securities prohibited by F.S. §517.07. The

subject securities were neither exempt securities, nor sold pursuant to an exempt transaction, nor covered federal securities, nor registered securities pursuant to Chapter 517, Florida Statutes.

36. Pursuant to F.S. §517.02, no securities that are required to be registered under Chapter 517 shall be sold or offered for sale within this state unless such securities have been registered and unless prior to each sale the purchaser is furnished with a prospectus meeting the requirements of the rules adopted by applicable law.

37. Pursuant to F.S. §517.12(1), no dealer, associated person, or issuer of securities shall sell or offer for sale any securities in or from offices in this state, by mail or otherwise, unless the person has been registered with the Florida Department of Banking and Finance.

38. The defendant failed to furnish plaintiff with a valid prospectus prior to every investment and no exemption from registration is applicable.

39. Defendant was not registered as required by F.S. §517.12.

40. As a result of the conduct set forth, Defendant violated F.S. §517.07 and 517.12 of the Florida Securities and Investor Protection Act.

41. By virtue of defendant's wrongful acts, Plaintiff has been injured in connection with their investments in the certificates and is entitled to the remedies set forth in F.S. §517.211.

42. Plaintiff has been required to retain counsel and defendant is obligated to pay counsel reasonable attorney's fees pursuant to FIPA.

WHEREFORE, Plaintiff hereby demand judgment against defendant for:

a. rescission, as applicable, plus prejudgment interest;

b. reasonable attorney's fees and other disbursements as permitted by applicable law;

c. costs of suit; and

d. such other and further relief as this court deems just and proper.

**COUNT III**

(Cause of Action Under F.S. §517.211 and 517.312 for Violation of F.S. §517.301)

43. Plaintiff realleges paragraphs 1 through 23 and 34 through 42 as if fully set forth herein.

44. The investments offered and sold to plaintiff by defendant were securities as defined by F.S. §517.021.

45. In connection with defendant's rendering of investment advice to plaintiff, or its offering and selling investments or securities to plaintiff, defendant engaged in the following activities:

a. employing a device, scheme, or artifice to defraud plaintiff;

b. obtaining money from plaintiff by means of an untrue statement of material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances, not misleading; and

c. engaging in a transaction, practice or course of business which operated as a fraud or deceit upon plaintiff.

46. Plaintiff reasonably relied on the misrepresentations made by defendant and plaintiff further relied upon the misimpression created by defendant's omissions from disclosure of material facts.

47. Based on the foregoing, defendant violated Section 517.301 of the Florida Securities and Investor Protection Act.

48. Plaintiff has been required to retain counsel and defendant is obligated to pay counsel reasonable attorney's fees pursuant to FIPA.

WHEREFORE, Plaintiff hereby demand judgment against defendant for:

a. rescission, as applicable, plus prejudgment interest;

b. reasonable attorney's fees and other disbursements as permitted by applicable law;

c. costs of suit; and

d. such other and further relief as this court deems just and proper.

**COUNT IV**

(Common Law Fraud)

49. Plaintiff realleges paragraphs 1 through 23, 34 through 42, and 44 through 48 as if fully set forth herein.

50. Defendant made false and fraudulent representations and omitted to state material facts in order to induce plaintiff to make the investments in the certificates referred to herein.

51. Defendant knew of the falsity of the its fraudulent representations and knowingly and willfully omitted to state material facts.

52. Plaintiff justifiably relied upon the fraudulent representations and omissions in statements of material facts in determining that the investments were suitable for him and in making the investments.

53. The damages plaintiff has sustained are the direct and proximate result of the foregoing alleged wrongful conduct on the part of the defendant.

WHEREFORE, plaintiff demands judgment for damages against the defendant, together with costs of suit, and prejudgment interest.

**COUNT V**

(Breach of Contract)

54. Plaintiff realleges paragraphs 1 through 23 as if specifically set forth herein.

55. The defendant's failure to pay the plaintiff the advertised stud fee on both certificates by January 31, 2016 after demand constitutes a material breach of contract.

56. As a direct and proximate result of the defendant's breach of contract the plaintiff has suffered damages.

57. All conditions precedent to this action have been performed, waived, or excused.

58. The contract between the parties contains a provision for attorneys' fees to the prevailing party. Plaintiff has become obligated to retain counsel to bring this action and defendant is required to pay the reasonable fees for those services.

WHEREFORE, the plaintiff prays for judgment against defendant for damages, costs of suit, attorneys' fees, and prejudgment interest.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38, Federal Rule of Civil Procedure, the plaintiff hereby demands trial by jury on all issues so triable.

MICHAEL V. LAURATO
Florida Bar Number: 181447
AUSTIN & LAURATO, P.A.
1902 W. Cass Street
Tampa, Florida 33606
(813)258-0624
(813)258-4625 Facsimile
mlaurato@austinlaurato.com
efile@austinlaurato.com
TRIAL COUNSEL FOR PLAINTIFF




Discover why

**STONEWALL FARM OCALA**

offers more options and higher potential for return on investment than any other

**LIFETIME BREEDING RIGHTS PROGRAM.**

A Stonewall Farm Ocala representative is standing by to explain the details of this exciting program.

**Stop by the farm this weekend and see what a truly great LBRP is all about!**

**BIG DRAMA**

Montbrook / Riveting Drama 2012 fee: $10,000 LFSN BC / FSS nominated

**Nothing Compares to the Flexibility of a Stonewall Lifetime Breeding Right:**

1. There is no obligation to breed your mare. In fact, if you choose not to breed at any time, we will will market your season for you.
2. At your discretion, you may sell your breeding right privately or at auction. There are no restrictions compared to other LBR Programs.
3. If a stallion is sold, and you choose to relinquish your LBR you may be eligible to receive a 200% rebate on your investment.
3. Smart breeders and investors purchase lifetime breeding rights from Stonewall Farm Ocala. Why? Because we provide:
   a.) the most friendly and investment savvy terms
   b.) the Finest Stallions in Florida!

**STONEWALL FARM**
OCALA

**Inquiries to: (352) 620-0907**

Four Bloodstock Professionals to Serve You
Michelle Hemingway (352) 895-6512
Christine Jones (352) 804-6618
Monica Bruun (352) 207-3018
Mark McCullough (352) 209-6588

Farm Manager, Dani Dougherty (352) 789-9327 Fax (352) 620-0908
www.stonewallfarmocala.com

Rusty F.Y.I. Mark

Exhibit "A"

## LIFETIME BREEDING RIGHT CERTIFICATE
## BIG DRAMA LIFETIME BREEDING RIGHT CERTIFICATE NUMBER (   )

For good and valuable consideration effective Oct 22, 2011, Family Broodmares V, LLC ("The ("Owner/Seller") hereby grants unto [illegible] ("The Purchaser") one (1) **LIFETIME BREEDING RIGHT** (Certificate number 5) in the Thoroughbred stallion **BIG DRAMA**, 2005 Bay Horse by Montbrook out of Riveting Drama by Notebook.

1. The purchase price of the Lifetime Breeding Right Certificate Number 5 shall be in the amount of ~~Thirty Five~~ Thirty Two Thousand Five hundred Dollars and 00/100 (~~$35,000.00~~) $32,500. RK HH

2. The Lifetime Breeding Right shall permit the Purchaser in the first year to breed two (2) qualified mares to the Thoroughbred stallion BIG DRAMA for a guaranteed live foal stand and nurse. In the second year of the Lifetime Breeding Right the Purchaser shall breed one (1) qualified mare for a live foal stand and nurse, and for each successive year, Purchaser, shall breed one (1) qualified mare thereafter for a live foal stand and nurse. Should the qualified mare be barren to the cover of BIG DRAMA or produces a foal that does not stand and nurse for that year, then Purchaser may rebreed the qualified mare (or approved substitute mare) the next year, without penalty or loss of use of the Lifetime Breeding Right for that barren or non live foal year.

3. The Term Qualified mare shall be based on the mare's race record and/or production record and/or pedigree and shall be determined by the Bloodstock advisor of the farm where BIG DRAMA is standing, Stonewall Farm Ocala, LLC. The Qualified mare shall be of breeding soundness.

4. The Lifetime Breeding Right shall be transferrable, either by assignment, sale, or trade after the first year of breeding the two (2) qualified mares without penalty and upon written notification to Owner/Seller. Should Purchaser elect not to breed one (1) or both qualified mares within the First year of the Lifetime Breeding Right, Purchaser shall authorize Stonewall Farm Ocala LLC, to utilize the breeding right to one or both mares at the agreed fee of $10,000.00 and in return guarantees a live foal(s) from such use of the breeding rights, and monetary compensation in the amount of $10,000 if one breeding right is used and $20,000, if both breeding rights are used for the First year. Payment for the use of the Lifetime Breeding Right shall take a Super Priority as stud fees are paid for that year and said Super Priority payment shall be in January, from the Owner/Seller of the Lifetime Breeding Right, herein named. Purchaser may after the Second year elect not to breed one (1) qualified mare and receive such monetary compensation deemed Super Priority in January of the Third year of the Lifetime Breeding Right as described above.

5. Purchaser of this Lifetime Breeding Right shall not be obligated to pay any expenses associated with the Thoroughbred stallion BIG DRAMA, other than sales tax and/or usage tax if applicable, and said expenses shall be the sole responsibility of the Owner/Seller, upon execution of this Lifetime Breeding Right.

6. The Owner/Seller warrants that they are the lawful owners of the Thoroughbred stallion, BIG DRAMA, and have the authority, right and title to lawfully enter into this Lifetime Breeding Right agreement with Purchaser and to convey to Purchaser said Lifetime Breeding Right as described above.



Exhibit "B"

7. The Owner/Seller warrants the Thoroughbred stallion BIG DRAMA, shall be presented for breeding purposes to commence for Northern Hemisphere purposes in 2012.

8. In the event that the Thoroughbred stallion, BIG DRAMA, be sold or be placed for syndication, after execution of this Lifetime Breeding Right, Purchaser shall have the right to elect to assign, transfer, trade or sell his/her Lifetime Breeding Right to the entity purchasing, or syndicating the Thoroughbred stallion BIG DRAMA, for fair market value and without penalty. Should Purchaser elect not to assign, trade or sell his/her Lifetime Breeding Right at the time of the sale or syndication of the Thoroughbred stallion, BIG DRAMA, said sale or syndication shall be subject to this Lifetime Breeding Right of Purchaser and shall carry forward. If the Thoroughbred stallion, BIG DRAMA is sold or syndicated to stand outside the territorial United States (other than for Southern Hemisphere breeding), and the Purchaser, if he/she does not elect to assign, trade or sell the Lifetime Breeding Right to the new subsequent buyer or new syndication, or utilize the Lifetime Breeding Right himself/herself, Owner/Seller warrants and guarantees to repurchase that Lifetime Breeding Right for Seventy-Five Thousand Dollars ($75,000.00).

9. In the event of the death or incapacity or loss of fertility of the Thoroughbred stallion, BIG DRAMA, Owner/Seller agrees to refund Purchaser ~~up to~~ 100% of the original Lifetime Breeding Right purchase price, located above, if same occurs within the first year of the Lifetime Breeding Right. In ~~the event of the death or incapacity or loss~~ of fertility of the ~~Thoroughbred stallion BIG DRAMA, occurs in the second year of the Lifetime Breeding Right, Owner/Seller shall pay the original purchase price and refund the balance in full to Purchaser.~~

/ for second R K.K MH

10. The Purchaser has examined and inspected the Thoroughbred stallion BIG DRAMA, and hereby accepts, and acknowledges his/her acceptance, of the Lifetime Breeding Right on an "AS IS" and "WITH ALL FAULTS" basis, and Owner/Seller makes no representations, warranties, express or implied regarding the Thoroughbred stallion BIG DRAMA or the Lifetime Breeding Right, including but not limited to, any warranty of health, breeding soundness, merchantability or fitness for a particular purpose.

11. This Lifetime Breeding Right may not be altered or amended without written consent of the parties named herein and shall be governed and construed in accordance with the laws of the state of Florida and each party agrees that exclusive jurisdiction and venue to resolve any dispute hereunder is Marion County, Florida. In the event litigation is commenced with respect to any dispute arising from this Lifetime Breeding Right, the prevailing party shall be entitled to recover its costs and expenses thereof, including its reasonable attorneys' fees, from the non-prevailing party.

**OWNER:**
FAMILY BROODMARES V., LLC

By: [signature] Michelle Hemingway

PRINT NAME: Michelle Hemingway

Date: 12/22/2011

**PURCHASER:**

By: [signature]

PRINT NAME: Rostyslaw Kindrat

Date: 12/22/11

# LIFETIME BREEDING RIGHT CERTIFICATE
## BIG DRAMA LIFETIME BREEDING RIGHT CERTIFICATE NUMBER ( )

For good and valuable consideration effective Dec 22, 2011, Family Broodmares V, LLC ("Owner/Seller") hereby grants unto Rostyslaw Kondratiw ("The Purchaser") one (1) **LIFETIME BREEDING RIGHT** (Certificate number 4) in the Thoroughbred stallion **BIG DRAMA**, 2005 Bay Horse by Montbrook out of Riveting Drama by Notebook.

1. The purchase price of the Lifetime Breeding Right Certificate Number 4 shall be in the amount of Thirty-Five Thousand Dollars and 00/100 ($35,000.00).

2. The Lifetime Breeding Right shall permit the Purchaser in the first year to breed two (2) qualified mares to the Thoroughbred stallion BIG DRAMA for a guaranteed live foal stand and nurse. In the second year of the Lifetime Breeding Right the Purchaser shall breed one (1) qualified mare for a live foal stand and nurse, and for each successive year, Purchaser, shall breed one (1) qualified mare thereafter for a live foal stand and nurse. Should the qualified mare be barren to the cover of BIG DRAMA or produces a foal that does not stand and nurse for that year, then Purchaser may rebreed the qualified mare (or approved substitute mare) the next year without penalty or loss of use of the Lifetime Breeding Right for that barren or non live foal year.

3. The Term Qualified mare shall be based on the mare's race record and/or production record and/or pedigree and shall be determined by the Bloodstock advisor of the farm where BIG DRAMA is standing, Stonewall Farm Ocala, LLC. The Qualified mare shall be of breeding soundness.

4. The Lifetime Breeding Right shall be transferrable, either by assignment, sale, or trade after the first year of breeding the two (2) qualified mares without penalty and upon written notification to Owner/Seller. Should Purchaser elect not to breed one (1) or both qualified mares within the First year of the Lifetime Breeding Right, Purchaser shall authorize Stonewall Farm Ocala LLC. to utilize the breeding right to one or both mares at the agreed fee of $10,000.00 and in return guarantees a live foal(s) from such use of the breeding rights, and monetary compensation in the amount of $10,000 if one breeding right is used and $20,000, if both breeding rights are used for the First year. Payment for the use of the Lifetime Breeding Right shall take a Super Priority as stud fees are paid for that year and said Super Priority payment shall be in January, from the Owner/Seller of the Lifetime Breeding Right, herein named. Purchaser may after the Second year elect not to breed one (1) qualified mare and receive such monetary compensation deemed Super Priority in January of the Third year of the Lifetime Breeding Right as described above.

5. Purchaser of this Lifetime Breeding Right shall not be obligated to pay any expenses associated with the Thoroughbred stallion BIG DRAMA, other than sales tax and/or usage tax if applicable, and said expenses shall be the sole responsibility of the Owner/Seller, upon execution of this Lifetime Breeding Right.

6. The Owner/Seller warrants that they are the lawful owners of the Thoroughbred stallion, BIG DRAMA, and have the authority, right and title to lawfully enter into this Lifetime Breeding Right agreement with Purchaser and to convey to Purchaser said Lifetime Breeding Right as described above.

7. The Owner/Seller warrants the Thoroughbred stallion BIG DRAMA, shall be presented for breeding purposes to commence for Northern Hemisphere purposes in 2012.

8. In the event that the Thoroughbred stallion, BIG DRAMA, be sold or be placed for syndication, after execution of this Lifetime Breeding Right, Purchaser shall have the right to elect to assign, transfer, trade or sell his/her Lifetime Breeding Right to the entity purchasing, or syndicating the Thoroughbred stallion BIG DRAMA, for fair market value and without penalty. Should Purchaser elect not to assign, trade or sell his/her Lifetime Breeding Right at the time of the sale or syndication of the Thoroughbred stallion, BIG DRAMA, said sale or syndication shall be subject to this Lifetime Breeding Right of Purchaser and shall carry forward. If the Thoroughbred stallion, BIG DRAMA is sold or syndicated to stand outside the territorial United States (other than for Southern Hemisphere breeding), and the Purchaser, if he/she does not elect to assign, trade or sell the Lifetime Breeding Right to the new subsequent buyer or new syndication, or utilize the Lifetime Breeding Right himself/herself, Owner/Seller warrants and guarantees to repurchase that Lifetime Breeding Right for Seventy-Five Thousand Dollars ($75,000.00).

9. In the event of the death or incapacity or loss of fertility of the Thoroughbred stallion, BIG DRAMA, Owner/Seller agrees to refund Purchaser ~~up to~~ 100% of the original Lifetime Breeding Right purchase price, located above, if same occurs within the first [or second] year of the Lifetime Breeding Right. ~~In the event of the death or incapacity or loss of fertility of the Thoroughbred stallion BIG DRAMA, occurs in the second year of the Lifetime Breeding Right, Owner/Seller shall pay the original purchase price and refund the balance in full to Purchaser.~~ R.K. MH

10. The Purchaser has examined and inspected the Thoroughbred stallion BIG DRAMA, and hereby accepts, and acknowledges his/her acceptance, of the Lifetime Breeding Right on an "AS IS" and "WITH ALL FAULTS" basis, and Owner/Seller makes no representations, warranties, express or implied regarding the Thoroughbred stallion BIG DRAMA or the Lifetime Breeding Right, including but not limited to, any warranty of health, breeding soundness, merchantability or fitness for a particular purpose.

11. This Lifetime Breeding Right may not be altered or amended without written consent of the parties named herein and shall be governed and construed in accordance with the laws of the state of Florida and each party agrees that exclusive jurisdiction and venue to resolve any dispute hereunder is Marion County, Florida. In the event litigation is commenced with respect to any dispute arising from this Lifetime Breeding Right, the prevailing party shall be entitled to recover its costs and expenses thereof, including its reasonable attorneys' fees, from the non-prevailing party.

**OWNER:**
FAMILY BROODMARES V., LLC

By: Michelle Hemingway

PRINT NAME: Michelle Hemingway

Date: 12/22/2011

**PURCHASER:**

By: [signature]

PRINT NAME: Rostyslav Kindyi

Date: 12/22/11